(C.D. 2548)

Hoyt, Shepston & Sciaroni Robert O. Bossinger & Co. *v.* United States

United States Customs Court, Second Division

(Decided June 24, 1965)

*Glad & Tuttle* (*George R. Tuttle, Jr.*, of counsel) for the plaintiffs.
*John W. Douglas*, Assistant Attorney General (*Richard J. Kaplan* and *Alfred A. Taylor, Jr.*, trial attorneys), for the defendant.

Before RAO and FORD, Judges

RAO, Judge: This is a protest against the collector's assessment of duty at the rate of 22½ per centum ad valorem upon an importation of merchandise invoiced as mauls with axe eye. It is not clear from the record or from the official papers whether this action was predicated upon the provision for hammers in paragraph 396 of the Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, 86 Treas. Dec. 121, T.D. 52739, supplemented by Presidential proclamation, 86 Treas. Dec. 337, T.D. 52820, or upon the provision for all other cutting tools in said paragraph 396, as modified by the Annecy Protocol to the General Agreement on Tariffs and Trade, 84 Treas. Dec. 403, T.D. 52373, supplemented by Presidential proclamation, 85 Treas. Dec. 116, T.D. 52462.

It appears, however, that counsel for the Government, although admitting that items like those in issue have been classified as cutting tools, takes the position, for the purposes of the present litigation, that the collector considered the subject articles to be hammers.

In any event, it is the contention of plaintiffs that the instant mauls are neither hammers nor cutting tools, within the purview of said paragraph 396, as modified by the respective trade agreements, *supra*, but that they are, in fact, or in contemplation of law, wedges, which are provided for in paragraph 326 of said act, as modified by said Torquay protocol, at the rate of 11⁄16 of 1 cent per pound.

The provisions in question are as follows:

Paragraph 396 of the Tariff Act of 1930, as modified by the Torquay protocol, *supra*—

Pipe tools, wrenches, spanners, screw drivers, bit braces, vises, and hammers; all the foregoing, if hand tools not provided for in paragraph 352, Tariff Act of 1930, and parts thereof, wholly or in chief value of metal, not specially provided for_____ 22½% ad val.

    *       *       *       *       *       *       *

Paragraph 396 of the Tariff Act of 1930, as modified by the Annecy protocol, *supra*—

Drills (including breast drills), bits, gimlets, gimlet-bits, countersinks, planes, chisels, gouges, and other cutting tools; all the foregoing, if hand tools not provided for in paragraph 352, Tariff Act of 1930, and parts thereof, wholly or in chief value of metal, not specially provided for_____ 22½% ad val.

Paragraph 326 of said act, as modified by said Torquay protocol—

Blacksmiths' hammers, tongs, and sledges, track tools, wedges, and crowbars, of iron or steel_____ 11⁄16¢ per lb.

Evidence as to the character, composition, and use of the instant mauls was given by Mr. Edward W. Strohecker, one of the owners of plaintiff, Robert O. Bossinger & Co., who testified on behalf of plaintiffs. This witness also produced for admission into evidence a sample of the imported articles representative in all respects, except as to weight (plaintiffs' exhibit 1), an axe (plaintiffs' exhibit 2), and a wedge (plaintiffs' exhibit 3).

The sole evidence for the defendant consisted of two pages of a catalog (exhibit A) of the Klein-Logan Co., a manufacturer of various kinds of tools.

According to the witness, his company is primarily engaged in the heavy hardware business as importer, wholesale distributor, and representative. It has been importing the articles at bar for about 6 years, but has handled a comparable domestic item produced by the Klein-Logan Co. for about 25 years. He gave the following description of the manner in which this article is used:

It may be used in two ways. They can either be initially propelled into a piece of material by holding it in your left or right hand, whichever you are, and hitting it on the head with another instrument such a [sic] sledge hammer or something of that nature. And in this manner it may be used identically as that of a common, what we commonly refer to as a splitting wedge. Or a handle may be inserted into the eye of the tool and then motivated by your own force the tool may be projected into the material you are working with.

In the opinion of Mr. Strohecker, the subject mauls are distinguishable from axes in that they are of different composition and construction. The former are composed of a substantially greater amount of steel and differ in taper from the bit to the head. Articles like exhibit 1 are so constructed that propulsion force exerted against them will cause a splitting of fibers rather than a breaking or cutting. An axe is of much lighter material, is made of a higher quality product, and is ground and tempered five times. It has a long taper of approximately 1 to 3 inches and can cut as well as split. He likened exhibit 1 to the wedge in evidence as plaintiffs' exhibit 3 in that it is a heavier item than an axe, is made of a substantially greater amount of material, tempered but not ground, and performs much the same basic function.

The witness was of opinion that splitting and cutting are distinguishable operations in that the former causes a separation of wood along the natural grain, the latter has the capacity to separate either with or against the grain. He did not believe that plaintiffs' exhibit 1 would be useful for cutting wood against the grain.

In the respect that Webster's New International Dictionary, 1933 edition, defines a wedge as an item of metal tapering to a thin edge, used in splitting wood, Mr. Strohecker was in general agreement with it, and he stated that exhibit 1 could be used in this manner.

When, however, a handle is inserted, the flat surface of the item could be used as a hammer, although it is not particularly suitable for that purpose as it is not properly balanced for such use. Moreover, the article is imported without a handle.

On cross-examination, this witness stated that a maul, such as plaintiffs' exhibit 1, has a hole in it for the insertion of a handle. Although the hole is designated as an axe-eye hole because it is approximately 1½ to 2 inches in length, approximately three-quarters of an inch in width, and tapers from both extremes to the center, the handle used with exhibit 1 would not work on any other tool. The designation "axe-eye hole" is a term employed in the handle and forging industries to indicate any elongated eye, not necessarily only the hole in the head of an axe.

The witness identified item No. 122 on pages 10 and 11 of the catalog of the Klein-Logan Co. as a woodchopper's maul with an axe eye, similar to plaintiffs' exhibit 1. He further testified that plaintiffs' exhibit 1 could be used with or without a handle; that he did not believe that the handle adds anything to the quality of the product. However, he has sold such articles with handles. He described plaintiffs' exhibit 3 as an average-size wedge similar to one of the 13 wedges illustrated on pages 10 and 11 of defendant's exhibit A, and admitted that it does not have a hole in it. He agreed that most wedges are quite different in appearance from mauls, and that when a maul is used for its striking force, it is necessary to have a handle. Then, it is swung in a manner similar to an axe to perforate or penetrate a piece of material. It was the opinion of this witness that it would be exceedingly difficult to use an axe to split a log with the grain because after it penetrated 2 or 3 inches, it would become stuck. To split a log with the grain, it would be necessary to use a maul or a splitting wedge. In using the wedge, one would have to hold it in one hand and hammer with the other. A maul could be used to start a split in a log before the insertion of a wedge.

Mr. Strohecker was in substantial agreement with that portion of the definition of a maul in Webster's New World Dictionary, 1959, college edition, which describes it as "A very heavy hammer or mallet, often of wood, for driving stakes, wedges, etc." He stated that plaintiffs' exhibit 1 could drive a wedge, but could not be used to drive stakes.

On redirect examination, he indicated, however, that most mauls do not have a sharp edge, and that, therefore, plaintiffs' exhibit 1 does not fall within the dictionary definition of a maul.

Counsel for plaintiffs advert to the testimony of their witness, as well as to the dictionary definitions of the various tools mentioned in the record, to support the thesis that the subject mauls are more

properly characterized as wedges than as hammers or cutting tools. It is argued that since, under settled law, merchandise is dutiable in its condition as imported, and since in that condition these mauls were not equipped with handles, their use as wedges controls their classification.

It is the contention of the defendant that the record is inadequate to overcome the presumptively correct classification of the collector or to establish that the articles at bar fall within accepted definitions of the term "wedge."

In this, as in all customs litigation where the classification of imported merchandise is in issue, the decision of the collector as to the rate and amount of duties due and the provision of law under which such duties are assessed enjoys a presumption of correctness. *McKesson & Robbins, Inc.* v. *United States*, 27 CCPA 157, C.A.D. 77. In addition, it is presumed that he has found the existence of every fact necessary to support his action. *E. I. du Pont de Nemours & Co.* v. *United States*, 27 CCPA 146, C.A.D. 75; *F. H. Kaysing* v. *United States*, 49 CCPA 69, C.A.D. 798. The burden rests with the party challenging the collector's findings not only to establish that his action was erroneous, but also to show that the claimed classification is correct. *United States* v. *Gardel Industries*, 33 CCPA 118, C.A.D. 325; *United States* v. *Victoria Gin Co., Inc., et al.*, 48 CCPA 33, C.A.D. 759.

So that, in this instance, whether or not the plaintiffs have established that the subject mauls are neither hammers nor cutting tools, they are not entitled to prevail, unless they have also affirmatively shown that these articles are wedges.

Although we have dwelt at some length upon the testimony of the witness for the plaintiffs in this case, it is clear that the ultimate conclusions to be reached are dependent upon the meanings to be ascribed to the various tariff designations in contention. Under settled principles of law, tariff terms are to be construed in accordance with their commercial meanings which, in the absence of proof of commercial designation, are presumptively those in common use. *Meyer & Lange et al.* v. *United States*, 6 Ct. Cust. Appls. 181, T.D. 35436; *United States* v. *Victoria Gin Co., Inc., et al., supra*.

Since the rule of commercial designation has not been invoked in this case, it follows that what must here be ascertained is common meaning. The common meaning of a tariff provision is a question of law to be resolved by the court. *United States* v. *Florea & Co., Inc.*, 25 CCPA 292, T.D. 49396; *United States* v. *O. Brager-Larsen*, 36 CCPA 1, C.A.D. 388; *United States* v. *National Carloading Corp., James S. Baker Import Co.*, 48 CCPA 70, C.A.D. 767. In finding common meaning, the court is privileged to consider relevant lexicographical definitions or the findings of other standard authorities. *United States* v. *John B. Stetson Co.*, 21 CCPA 3, T.D. 46319. Testi-

mony of witnesses experienced in the handling of the product may also be considered, but such testimony is advisory only and not binding upon the court. *Stephen Rug Mills* v. *United States*, 32 CCPA 110, C.A.D. 293; *Absorbo Beer Pad Co., Inc.* v. *United States*, 30 CCPA 24, C.A.D. 209.

In furtherance of their respective contentions as to the character and nature of the mauls in issue, adversary counsel have cited the following definitions:

Webster's New International Dictionary of the English Language, unabridged edition (1934)—

Wedge: 1. A piece of wood, metal, etc., tapering to a thin edge, used in splitting wood, rocks, etc., in raising heavy objects and the like.

Hammer: 1. An instrument for driving nails, beating metals, and the like consisting of a head, usually of steel or iron, fixed to a handle * * *.

Maul: 1. A heavy club, staff, or mallet, a mace. 2. Any of the various heavy hammers, as one for driving wedges or piles.

Funk & Wagnalls College Standard Dictionary of the English Language, unabridged edition (1922)—

Wedge: 1. One of the mechanical powers, practically a double-inclined plane; a V-shaped piece, as for splitting.

Funk & Wagnalls New Standard Dictionary of the English Language, unabridged edition (1921)—

Wedge: n. 1. One of the so-called mechanical powers, practically a double inclined plane; specif., a piece of wood, metal, etc., V-shaped in lengthwise section, properly used for splitting a substance apart or producing strong pressure as by forcing it in a crack or between objects. See mechanical powers.

Hammer: A hand-implement having a head at right angles to the handle, used for breaking, nailing, pounding, or flattening materials, etc. * * *

Maul: 1. A heavy wooden hammer; a beetle. Mauls are made also of metal, as iron and cast steel, and of different shapes, depending upon the work in view. Compare mallet.

The Century Dictionary, An Encyclopedic Lexicon of the English Language (1900 ed.)—

Wedge: 1. A simple machine consisting of a very acute-angled triangular prism of hard material, which is driven in between objects to be separated, or into anything which is to be split.

Webster's New International Dictionary, 1956—

Wedge 1. A piece of wood, metal, etc., tapering to a thin edge used in splitting wood, rocks, etc., in raising heavy bodies, and the like.

The American College Dictionary, 1962—

Wedge n. 1. A device (one of the so-called simple machines) consisting of a piece of hard material with two principal forces meeting in a sharply acute angle.

Webster's Third New International Dictionary, 1963—

Wedge 1: A piece of material (as wood or metal) tapering to a thin edge used for splitting wood or rocks, for raising heavy bodies, and by being driven into a space between objects for tightening.

Webster's Third International Dictionary, 1963—

hammer 1 a: hand tool consisting of a solid head set crosswise on a handle and used for pounding (as in driving nails, breaking stone, beating metal surfaces).

Webster's New International Dictionary, 1954—

hammer 1. An instrument for driving nails, beating metals, and the like, consisting of a head, usually of steel or iron, fixed crosswise to a handle.

Funk & Wagnalls New Standard Dictionary, 1952—

hammer n. 1. A hand implement having a head at right angles to the handle, used for driving nails, pounding, breaking, or flattening materials, etc.

The American College Dictionary, 1962—

hammer n. 1. An instrument consisting of a solid head, usually of metal, set crosswise on a handle, used for beating metals or driving nails, etc. 2. Any of various instruments or devices resembling a hammer in form, action or use.

It does not seem that the subject mauls fit cleanly within any of the foregoing descriptions. From the sample which is in evidence, and which, under settled law, is entitled to much weight (*United States* v. *The Halle Bros. Co.*, 20 CCPA 281, T.D. 46077), it would appear that these mauls are different from or more than any of the articles hereinabove defined. We deem it of some significance that none of the cited definitions makes reference to a handle in connection with a wedge, or indicates that a wedge would ordinarily be made with a hole to accommodate a handle.

Certainly, the construction of the articles at bar is such as to suggest that they are produced with a particular size and shape of hole for the purpose of being used with a handle and being swung in the manner of an axe, and that the striking force susceptible of attainment with a handle is a material element in its design. If this were not an important function of this tool, we consider it extremely unlikely that it would have been manufactured with a hole of that character.

We have carefully examined the illustrations of the 13 wedges which are shown in defendant's exhibit A as well as in plaintiffs' exhibit 3, and observe a marked difference between them and the three examples of mauls which are also depicted. All three mauls clearly are fitted with holes. None of the wedges is. Moreover, the plane of the wedge and the plane of the maul are not especially comparable.

While it may be that the tool in issue possesses some of the characteristics of a wedge, we cannot agree that in its condition as

imported it is, in fact, a wedge within any realistic definition of that term. In the absence of any affirmative indication that a wedge would ordinarily, or normally, or usually be constructed with a hole for use with a handle, or that a striking potential is a salient feature of a wedge, that characteristic must be regarded as inimical to the common understanding of what a wedge is.

Under the foregoing circumstances, it is unnecessary for the court to consider here whether the subject mauls are hammers or cutting tools within the provisions of paragraph 396, as modified, *supra*. The presumption of correctness of the collector's action has not been overcome.

All claims in the protest are, therefore, overruled.

Judgment will be entered accordingly.